1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **DISTRICT OF NEVADA**

9

10 UNITED STATES OF AMERICA,      )      3:05-cr-00098-HDM
                                 )      3:10-cv-00531-HDM
11          Plaintiff/Respondent, )
                                 )
12 vs.                           )      ORDER
                                 )
13 JOHNATHON ROBERTS,            )
                                 )
14          Defendant/Petitioner. )
   _____ )
15

16      Before the court is the defendant Johnathon Roberts'

17 ("Roberts") motion to vacate, set aside, or correct sentence

18 pursuant to 28 U.S.C. § 2255 (#377, #382, #383).  The government

19 has responded (#396), and Roberts has replied (#404, #406).

20 **Factual History**

21      On May 1, 2005, Anthony Gonzalez ("Gonzalez") called Jared

22 Chapman ("Chapman") in search of a good price on approximately

23 1,400 Ecstasy pills.  (Trial Tr. 200, 300-02).  Chapman contacted

24 his sister's boyfriend, Jonathan Woodbridge ("Woodbridge"), who

25 Chapman knew had sold drugs in the past.  (*Id.* at 200-01).  After

26 Woodbridge said he could obtain the pills, Chapman called Gonzalez

27 back and arranged a meeting. (*Id.*)

28      That evening, Roberts and Gonzalez drove from Reno, Nevada, to

1

Sacramento, California. (*Id.* at 305, 792-93). After meeting up with Chapman and Woodbridge, the four men drove in Roberts' car to an apartment complex where Woodbridge was to obtain the drugs. (*Id.* at 205, 307). Once there, Roberts and Gonzalez handed Woodbridge $4,300 for the purchase. (*Id.* at 206, 309, 802). Instead of going into an apartment to purchase the pills, however, Woodbridge took the money and left. (*Id.* at 206, 309-10).

Once he realized Woodbridge was not returning, Roberts got in the back seat, pulled out a gun, and pointed it at Chapman. (*Id.* at 210). He ordered Chapman, who was sitting in the back seat, to crawl into the front seat, and directed Gonzalez to drive the car back to Reno. (*Id.* at 210-11, 315). En route, Roberts told Chapman that if he did not return the $4,300 he was "not going to make it to see tomorrow." (*Id.* at 214). Roberts also called Jacob Belford ("Belford") and told him he needed his help and to meet him at his house. (*Id.* at 315, 606, 819-20).

Upon reaching Roberts' house in the early morning hours of May 2, 2005, Roberts took Chapman inside at gunpoint and ordered him to lie face down on the floor. (*Id.* at 217-18, 316). Belford and Gonzalez then went to a store and bought zip ties, duct tape, and rope, which they used to tie up Chapman. (*Id.* at 220, 324-37).

Gonzalez also bought a prepaid cell phone for Chapman to call Woodbridge, family, and friends to get the stolen money back. (*Id.* at 338-42). When Woodbridge refused to return the money, Chapman called his mother. (*Id.* at 232). After retrieving $2,500 of the $4,300 from Woodbridge and making up the difference with her own money, Chapman's mother reported the kidnaping to the police, which in turn contacted the FBI. (*Id.* at 61-62, 66-68).

2

In coordination with the FBI, Chapman's mother drove to Reno. (*Id.* at 72-73). Pursuant to FBI instructions, she persuaded Roberts and Gonzalez to meet her at the Reno Hilton. (*Id.* at 76). In the early morning hours of May 3, 2005, Roberts and Gonzalez arrived with Chapman at the Hilton, where they were then arrested. (*Id.* at 111-12, 116).

The next day, May 4, 2005, investigators went to Roberts' house and searched his garbage can. (*Id.* at 138-39). In it they found duct tape, zip ties, and other evidence associated with the kidnaping. (*Id.* at 139). After obtaining this evidence, the investigators secured a search warrant for Roberts' house. (*Id.* at 156). Agents conducted a search of the house on May 5, 2005. (*Id.*). There they found a number of firearms and other items connected to the kidnaping. (*Id.* at 161-70).

**Procedural History**

On May 11, 2005, the grand jury returned an indictment charging Roberts and Gonzalez with kidnaping and aiding and abetting in violation of 18 U.S.C. § 1201 and 18 U.S.C. § 2. On May 25, 2005, the grand jury returned a superseding indictment adding another defendant, Nick Calcese ("Calcese"), and another count, conspiracy to kidnap in violation of 18 U.S.C. § 1201(c).

On November 2, 2005, the grand jury returned a second superseding indictment adding a charge of carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). This charge was levied against Roberts and Calcese but not against Gonzalez. On November 30, 2005, the grand jury returned a third superseding indictment adding Belford as a defendant and one count of evidence tampering against Calcese.

Over the next several months, Belford, Calcese, and Gonzalez all entered signed plea agreements. Roberts proceeded to trial.

On June 13, 2006, Roberts' counsel, Loren Graham ("Graham"), moved to withdraw. The court granted the motion and appointed Marc Picker ("Picker") to represent Roberts.

On July 22, 2006, Picker filed a motion to dismiss the indictment, alleging that Roberts' right to a speedy trial had been violated by the numerous continuances stipulated to by the parties and granted by the court. On August 14, 2006, Picker filed a motion to suppress evidence obtained in a warrantless search of the vehicle Roberts drove to the Reno Hilton. At a hearing on August 17, 2006, the court denied both motions.

Trial commenced against Roberts on August 21, 2006. At trial, Roberts asserted a defense of duress. On August 28, 2006, the jury found Roberts guilty of all three counts of the third superseding indictment. The court sentenced Roberts to concurrent terms of imprisonment for the kidnaping and conspiracy to kidnap charges, and a mandatory consecutive term of imprisonment on the § 924(c) charge.

Roberts appealed his conviction. On March 20, 2009, the Ninth Circuit affirmed. Roberts filed a petition for rehearing *en banc*, which the circuit court denied. On August 25, 2010, Roberts filed the instant § 2255 motion.

**Standard**

A convicted defendant may move to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, if: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose

4

the sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. *Id.* § 2255(a); *see also United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010).

**Analysis**

Roberts asserts five grounds in support of his motion to vacate. First, he claims that his trial attorney, Marc Picker, rendered ineffective assistance of counsel in violation of his Sixth Amendment rights. Second, he claims that his Fifth and Sixth Amendment rights were violated when the court applied enhancements to his sentence based on facts that were not presented to the jury. Third, he claims that his Fourteenth Amendment rights were violated because he was denied access to a law library when he was preparing to represent himself for his sentencing. Fourth, he claims that his pretrial attorney, Loren Graham, rendered ineffective assistance of counsel by failing to protect his right to a speedy trial. Finally, he claims that he did not receive a fair trial in violation of his Fifth, Sixth, and Fourteenth Amendment rights because the government knowingly presented the false testimony of several witnesses.

I. Ineffective Assistance of Counsel – Attorney Marc Picker

Ineffective assistance of counsel is a cognizable claim under § 2255. *Baumann v. United States*, 692 F.2d 565, 581 (9th Cir. 1982). In order to prevail on a such a claim, the defendant must satisfy a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the defendant must show that his counsel's performance fell below an objective standard of reasonableness. *Id.* at 687-88. "Review of counsel's performance is highly

deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1986). Second, the defendant must show that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. This requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Roberts' claims of Picker's alleged ineffectiveness fall into four categories: (1) failure to call certain witnesses; (2) failure to impeach certain witness testimony; (3) failures regarding motions to suppress; and (4) failures regarding Roberts' speedy trial rights.[1]

A. Witnesses

Roberts asserts that Picker failed to call two witnesses who would have testified on his behalf: Ernest Saragosa and Samuel

---

[1] In his reply, Roberts claims that Picker was ineffective for failing to introduce evidence of Gonzalez's violent criminal history as described in Gonzalez's presentence report, for failing to elicit certain testimony from Special Agent Glen Booth, who investigated the kidnaping, and for failing to call a number of additional witnesses. These assertions were not part of Roberts' petition or the two supplements thereto. Generally an argument raised for the first time in a reply is considered waived and the court need not consider it. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Accordingly, the court will not consider these additional assertions. The court would note, however, that on cross-examination Picker did ask Gonzalez about the incident described in the presentence report. He also referred to it in his closing arguments. (Trial Tr. 424-27; *id.* at 1012). The court also notes that Booth's opinion regarding the truthfulness of witnesses would not have materially impacted the result of the trial given that the court specifically instructed the jury to consider the impact of prior felonies and plea bargains in assessing the credibility of co-defendant testimony. (*Id.* at 957-58).

Moore.

An attorney is ineffective for failing to introduce evidence demonstrating his client's factual innocence or evidence that "raises sufficient doubt as to that question to undermine confidence in the verdict." *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002). An attorney is also ineffective if he fails "to conduct a reasonable investigation" or to "make a showing of strategic reasons for failing to do so." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

The record does not support an assertion that Picker was ineffective for failing to present this evidence. In fact, Picker did investigate Saragosa and Moore as witnesses. At trial, Picker told the court that neither Saragosa nor Moore could be located. (Trial Tr. 353-56). The court directed Picker to attempt to locate them one more time. (*Id.* at 354, 357). After doing so, Picker reported that Moore had been located but was uncooperative, and that although Saragosa had given the investigator a statement in the past, he could no longer be located and in any event had not been cooperative. (*Id.* at 659).

Roberts disputes these representations and claims that both men were able and willing to testify.[2] He also asserts that, even if the witnesses were not cooperative, he was entitled to compulsory process under the Sixth Amendment.

___

[2] Roberts asserts that Picker was untruthful when he advised the court that Moore and Saragosa were unavailable to testify. There is no evidence that these statements were untrue. The investigator's ability to contact Moore during trial does not mean he was able to contact him before trial. And although Saragosa had been contacted by the investigator when Picker said he had not, the court is not persuaded that Picker's statement was untrue. Given that Picker generally understood Saragosa to be uncooperative, his statement that Saragosa had never been contacted was at most inaccurate.

There is no evidence on the record that Moore was willing to testify at Roberts' trial. In fact, what evidence there is (an investigator's report posttrial) clearly indicates that Moore was reluctant to cooperate. Nothing in that report or anywhere else in the record suggests that at the time of trial Moore was willing to testify on Roberts' behalf. Picker attests that Moore would not testify. (Gov't Opp'n Picker Aff. ¶ 8). As Picker understood Moore to be uncooperative, he made the strategic decision not to compel his testimony. *See Johnson v. Tennis*, 2006 WL 4392562, at *8 (E.D. Pa. 2006) (holding that strategic decision not to call uncooperative witnesses fell within trial counsel's discretion and citing cases in support). The court's review of Picker's performance is highly deferential, and the court cannot say that Picker's actions in this regard fell outside the wide range of reasonable representation.

Saragosa attests that he never told any investigator that he was unwilling to cooperate, and that he provided the investigator with all the information he now provides to the court.[3] (Def. Pet. Ex. 12 (Saragosa Aff. ¶¶ 30-32)). He further states that Picker and the investigator "had all of my contact information and knew exactly where to reach me." (*Id.* ¶ 33). Even if Saragosa's assertions are true, he has not stated that he was available to testify at the time of Roberts' trial or that he could have been reached through the contact information Picker and the investigator had at that time. Assuming Saragosa was available and could have been reached at the time of trial, there is still nothing in the

---

[3] Picker asserts Saragosa never provided the investigator with the information in his affidavit. (*See* Gov't Opp. Picker Aff. ¶¶ 10-11).

record that contradicts Picker's assertion that he was told by the investigator that Saragosa was unwilling to cooperate. Picker was entitled to rely on the investigator to tell him which witnesses were available and cooperative and which were not. *See Wilson v. Sirmons*, 536 F.3d 1064, 1136 (10th Cir. 2008) ("It is well-settled counsel may rely on the efforts of co-counsel, investigators, and experts in preparing for trial."). As with Moore, Picker's failure to call a witness he believed to be uncooperative was a strategic decision well within his discretion and was not outside the range of reasonable representation.

Even if the failure to call Saragosa was not reasonable, however, Roberts cannot show he was prejudiced by Picker's decision. Saragosa states that he came by Roberts' house on the afternoon of May 2, 2005, while Chapman was there. (Def. Mot. Ex. 12 (Saragosa Aff. ¶¶ 1-2)). While he was there, Saragosa claims, Chapman did not appear to be afraid of Roberts and did not seem as though he had been kidnaped. (*Id.* ¶ 5-6). Further, he asserts, Roberts did not threaten or act violently toward Chapman, did not make him do anything against his will, and did not tell Chapman he could not leave. (*Id.* ¶¶ 7-9, 13). However, Saragosa does not state how long he was at Roberts' house and does not otherwise state that he had personal knowledge of everything that took place that day.

Saragosa also asserts that Chapman was not restrained, had several opportunities to leave, and in fact "seemed to be enjoying himself and acting normal as he was drinking beer, smoking marijuana, watching television and socializing." (*Id.* ¶¶ 12-14). For the most part, however, such testimony would have been

9

cumulative. Nick Calcese testified that he removed the zip ties from Chapman's wrists before they ate sandwiches the morning of May 2, 2005, and that Chapman was not restrained again after that. (Trial Tr. 566-57). He also testified that Chapman smoked marijuana while at the house. (*Id.* at 567). Even though Chapman did not admit to being freed from restraint, he did admit to smoking marijuana and eating. (*Id.* at 247-48). Accordingly, Saragosa's testimony in this regard would not have added anything the jury had not already heard.

In addition, Saragosa's affidavit includes statements as to Roberts' character. Such evidence was presented by other witnesses at trial and therefore would also have been cumulative. (Def. Mot. Ex. 12 (Saragosa Aff. ¶¶ 21-29); *see also, e.g.*, Trial Tr. 702-03, 707-08, 778-79).

Finally, Saragosa asserts that Roberts did not seem himself, appeared afraid of Gonzalez, and kept reiterating that Saragosa needed to leave the house before Gonzalez returned. (Def. Mot. Ex. 12 (Saragosa Aff. ¶¶ 16-20)). Such testimony would have bolstered Roberts' defense of duress. However, the jury was not without evidence on this point. Roberts himself testified that Gonzalez had pulled a gun on him and threatened him and his family. (Trial Tr. 814-15, 848-49). Moreover, another witness, Johnnie Stafford, testified that Gonzalez admitted to pulling a gun on Roberts and threatening him. (Trial Tr. 683-85). Accordingly, Saragosa's testimony as to Roberts' state of mind would not have added information that the jury did not already have. There is thus no reasonable probability that Saragosa's testimony would have changed the outcome of the trial. Roberts has therefore failed to show any

prejudice on this claim.

Roberts has failed to show that Picker's failure to call Saragosa and Moore as witnesses fell outside the wide range of reasonable representation or that it prejudiced his defense.[4]

B. Impeachment

Roberts asserts that Picker did not adequately impeach the testimony of the kidnaping victim, Jared Chapman. Specifically, Roberts contends that when the government stated Chapman had no reason to lie about Roberts' role in the kidnaping, Picker should have argued that Chapman might have been untruthful because he was angry about the incident. Picker did, however, suggest reasons Chapman might have been untruthful, as is clear even in the passage of the trial transcript Roberts cites. (Trial Tr. 284-85). Picker was entitled to make strategic decisions about his representation of Roberts, and choosing the grounds on which to impeach a witness' testimony is one such strategic decision.

For the first time in his reply, Roberts also faults Picker for failing to rebut Chapman's story when it was clear his testimony was inconsistent. Even if the court were to consider these contentions, *see supra* n.2, the claim is without merit. The jury heard Chapman's testimony and Picker cross-examined Chapman on his inconsistent statements. (Trial Tr. 282-83). Although Roberts claims that Picker should have reiterated the inconsistencies

---

[4] Roberts argues in a conclusory fashion that Picker did not call Moore and Saragosa as witnesses because he had a close personal friendship with the prosecutor and was therefore unwilling to be a zealous advocate on Roberts' behalf. Picker denies that his friendship caused him to represent Roberts any less effectively. (Gov't Opp. Picker Aff. ¶¶ 12-13). Picker fully and reasonably represented Roberts in this matter, and the record does not support any inference that Picker limited his representation of Roberts because of any alleged friendship.

during closing arguments, there is no reasonable probability that doing so would have changed the jury's verdict. The jury was fully aware of Chapman's testimony and heard his inconsistent statements. The jury thus had all the evidence necessary to decide whether Chapman was truthful. Accordingly, Roberts has not established that Picker was ineffective in the manner in which he cross-examined Chapman.

C. Suppression

Roberts argues that Picker was ineffective because he did not move to suppress evidence found in Roberts' garbage can. He also argues Picker was ineffective because, although he moved to suppress the contents of a cell phone found in the car Roberts drove to the Reno Hilton, he argued only that the search of the car was unlawful. Roberts asserts that Picker should have argued that a warrant was required to search the phone.

1. Garbage Can[5]

On Wednesday, May 4, 2005, FBI agents conducted a warrantless search of Roberts' outdoor garbage can. Inside, they found several items related to the kidnaping, including duct tape, zip ties, and food wrappers. The agents then obtained a warrant to search Roberts' home. In the house, they found several other incriminating items, including a number of firearms.

---

[5] The government argues this claim was procedurally defaulted because Roberts did not raise it on direct appeal. Roberts is not raising a Fourth Amendment claim, however. Rather, he is arguing that counsel was ineffective for failing to raise this Fourth Amendment claim. Roberts was not required to raise his ineffective assistance of counsel claim on direct appeal. *United States v. Braswell*, 501 F.3d 1147, 1150 n.1 (9th Cir. 2007) (citing *Massaro v. United States*, 538 U.S. 500, 505 (2003)); *see also United States v. Withers*, 638 F.3d 1055, 1066 (9th Cir. 2011). Accordingly, this claim is not procedurally defaulted.

12

At trial, Special Agent Glenn Booth testified that the agents had located the garbage can by the street in front of Roberts' house. (Tr. 139). In his petition, Roberts disputes that his garbage can was placed on the street for collection. Rather, he argues, it was obscured from view within the curtilage of his home. Roberts filed several affidavits stating that his customary practice was to keep the garbage can next to his home except for Sunday evenings, when he would place it out for collection the next day. Some affidavits also attest that the can was not out for collection on either the day of the warrantless search, Wednesday, May 4, 2005, or the day before, Tuesday, May 3, 2005. Although the affidavits submitted by the defendant state that at the time of the search the garbage was collected on Mondays, the government has presented compelling evidence establishing the day of collection was Tuesday.

On April 3, 2012, the court conducted an evidentiary hearing in order to resolve certain material factual disputes raised by the pleadings.

The evidence is insufficient to establish that Roberts ever told Picker about the information and witnesses he now presents. Roberts did not testify that he did so at the evidentiary hearing. And while Roberts asserts generally in his response to the government's supplement (#422) that he "did bring the information to counsel's attention," the only evidence in the record on this point is Roberts' affidavit, and the affidavit states only that Roberts "told Marc Picker to object to the government's use of the evidence that is being challenged [but that] Mr. Picker declined to do so." (Doc. # 404, Def. Reply Ex. D (Roberts Aff. ¶ 19)). In

contrast, Picker attests that while he understood the search of the garbage can to be "an important issue to Mr. Roberts," he does "not recall Mr. Roberts providing [him] any verifiable information or witness names that would have contradicted the testimony that the trash can was located on the sidewalk when it was initially searched." (Doc. #421, Gov't Supp. Att. 7 (Picker Aff. ¶¶ 4-5). Therefore the court concludes that Roberts has failed to establish that he provided Picker with sufficiently reliable and credible witnesses to rebut the evidence Picker had in his possession, which included two photographs, introduced as Exhibit 2 at the evidentiary hearing, that showed the garbage can in the location where the agents testified they found it. (*See* Doc. #442, Olson Aff. ¶¶3-5). Picker reviewed that evidence, along with the agents' testimony, and concluded "that the warrantless search was legal in that the garbage can was located on public property and that the photographs of its location when found were accurate." (*Id.* ¶ 4). Therefore the court concludes that Picker's failure to further investigate and file a motion to suppress did not fall below an objective standard of reasonableness.

Even if Picker had been aware of Roberts' contentions and was ineffective for failing to further investigate the issue, Roberts cannot show that he suffered prejudice as a consequence. The evidence was persuasive and credible that Special Agents Glenn Booth and Michael West located Roberts' garbage can on the curb in front of Roberts' house, next to the driveway. The evidence presented by Roberts was insufficient to impeach that testimony.

The credible evidence is that the trash can was located on the curb at the time the government agents searched its contents.

There is no objectively reasonable expectation of privacy in trash put out for collection. *California v. Greenwood*, 486 U.S. 35, 37, 39-40 (1988). A "warrantless search and seizure of garbage left for collection outside the curtilage of a home" thus does not violate the Fourth Amendment.[6] *Id.* at 40-41. Therefore the court concludes that Roberts' Fourth Amendment rights were not violated during the search of the garbage can. Roberts therefore cannot show that any failure on the part of his attorney Marc Picker to file a motion to suppress prejudiced his defense.

Roberts further asserts that he had an expectation of privacy in his garbage, pointing to the various measures he took to protect the trash from third parties. Roberts' assertion that even if the can were out for collection, the search violated his rights because he had a reasonable expectation of privacy in the can is without merit. The Supreme Court has clearly held such an expectation of privacy is not reasonable. *California v. Greenwood*, 486 U.S. 35, 37, 39-40 (1988).

2. Cell Phone

While Picker did file a motion to suppress evidence found on a cell phone seized from the car Roberts had been driving, Roberts asserts he should have argued that a warrant was required to search the phone. On direct appeal, Roberts argued that the court erred in admitting the cell phone's contents. The Court of Appeals held that any error was harmless. (*See* Doc. #366 *(*9th Cir. Mem. Disp. Dated Mar. 16, 2009, at 4)). The Ninth Circuit has held that

---

[6] Roberts attempts to distinguish the holding of *Greenwood* on the grounds that the officers had probable cause to search the Roberts' trash can as well as the cooperation of the trash collector. Those facts, however, were not relevant to *Greenwood*'s holding.

admission of the cell phone's contents into evidence did not prejudice Roberts.

D. Speedy Trial

Pursuant to the stipulations of the parties, Roberts' trial was continued several times. Roberts previously asserted before both this court and the Ninth Circuit that the continuances violated his speedy trial rights. Although Picker filed a motion to dismiss on these grounds, Roberts argues that he failed to make certain arguments and present certain evidence that would have led to a different result.

A defendant may not use § 2255 to relitigate issues that were decided on direct appeal. *United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985). The Ninth Circuit expressly rejected Roberts' claim that his speedy trial rights were violated. In particular, the court held that Roberts consented to most of the continuances and that the delay was not solely attributable to the government but also "to defendants' trial preparation time, co-defendants changing their pleas, and Roberts' dismissal of his attorney." (Doc. #366 (9th Cir. Mem. Disp. Dated Mar. 16, 2009, at 3)).

In his § 2255 motion, Roberts raises a number of allegations about the adequacy of the stipulations to continue, unethical dual representation of his interests by his co-defendants' attorneys, and the government's withholding of evidence in order to deliberately create a delay and secure the testimony of his co-defendants.

The Court of Appeals has already determined that Roberts' speedy trial rights were not violated because he consented to the continuances and contributed to the delay. The Ninth Circuit

16

acknowledged a presumption of prejudice in Roberts' favor but nonetheless held, based on the other factors, that no speedy trial violation had occurred. The court will not revisit this issue. *See Redd*, 759 F.2d at 701.

Roberts faults Picker for failing to impeach Graham's testimony at the motion to dismiss hearing when Graham testified that Roberts consented to most of the continuances.

All but one of the continuances occurred while Roberts was represented by Graham. The trial was continued for the last time after Graham withdrew from representation but before Picker was appointed. At the hearing on the motion to dismiss, this court called Graham to the stand. The court asked whether the representations in the stipulations that the defendants consented to the requests to continue were true. Graham responded "yes." (Tr. of Aug. 17, 2006, Hr'g 23). The court then asked at what point Roberts began to indicate that he did not want any more continuances. (*Id.* at 24). Graham responded that he was concerned about the attorney-client privilege. (*Id.* at 24). The court asked Roberts whether he would waive the privilege. (*Id.* at 24). Roberts refused. (*Id.* at 24). In the end, the court credited Graham's testimony that he had consulted with Roberts before almost every continuance was requested and granted. (Tr. of Aug. 17, 2006, Hr'g 26).

Roberts argues Picker should have presented several pieces of evidence bearing on Graham's credibility.

First, Roberts presents a visitation log for the Washoe County Jail, where Roberts was housed before trial, for the time period February 16, 2006 to May 5, 2006. The log shows that Graham did

not visit Roberts during that time period.  Roberts argues that this proves Graham could not have obtained Roberts' consent for the April 2006 continuance and that Picker should have pointed this out.  However, whether Graham visited Roberts between February and May 2006 is irrelevant, because the April 2006 stipulation did not represent that the defendants joined in the request.  The court's question to Graham was whether he had consulted with Roberts before filing the stipulations that indicated the defendants were joining in the request.[7]  (*See* Doc. # 94).  Graham's answer in the affirmative did not pertain to stipulations, such as that filed on April 10, 2006, that did not indicate the defendants were joining in the request.  Picker's failure to raise a meritless argument was not ineffective.

Second, Roberts asserts that Picker should have impeached Graham on a prior statement, which Roberts claims was inconsistent with his testimony at the motion to dismiss hearing.  At the October 19, 2005, calendar call, the defendants' attorneys, including Graham, requested a continuance, although Graham indicated that he had not yet consulted with Roberts.  The court granted the request and continued the trial.  Graham's testimony at the motion to dismiss hearing was not inconsistent with his October 19, 2005, statement.  Graham was not asked whether he had consulted with Roberts before *every* continuance.  He was asked whether he

---

[7] To the extent Roberts claims his failure to join in this request equates with a violation of his speedy trial rights, the Ninth Circuit has already squarely rejected this claim.  (*See* Doc. #366 (9th Cir. Mem. Disp. Dated Mar. 16, 2009, at 3)) (in finding that no speedy trial violation had occurred, explicitly recognizing that Roberts did not agree to <u>all</u> the continuances).  It may not be relitigated here.  *United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985).

consulted with him before those requests indicating the defendants joined in the request. Further, the October 19, 2005, continuance was supported by a signed stipulation on October 26, 2005, reflecting that the defendants joined in the request. Graham testified that this statement meant he had he consulted with Roberts. The court found this contention credible. That Graham did not consult with Roberts before the October 19, 2005, hearing does not mean he did not consult with Roberts before the October 26, 2005, stipulation was submitted.

The remaining evidence Roberts asserts Picker should have introduced includes his own letters to Graham stating that he did not want the trial continued, and affidavits and letters from his parents echoing these concerns.[8] However, the court was well aware of Roberts' contention that he had not agreed to the continuances. (*See* Tr. of Aug. 10, 2006, Hr'g 3, 18-19; Tr. of Aug. 17, 2006, Hr'g 18-19; Mot. Dismiss Dated July 22, 2006, at 2; Def. Mot. Dismiss Dated June 13, 2006; Tr. of June 13, 2006, Calendar Call 6). In fact, evidence was presented at the hearing on the motion to dismiss showing that Roberts resisted the continuances, including a tape-recorded conversation in which Roberts said that he believed his speedy trial rights were being violated and that he did not want the trial continued any more.[9] (*See* Tr. of Aug. 17,

---

[8] Roberts argues in his reply that Picker should have presented evidence showing that his co-defendants had also not agreed to continuances. The court will not consider this argument raised for the first time in Roberts' reply. *See supra* n.2.

[9] Roberts asserts that Picker should have used this recording at the motion to dismiss hearing. However, the recording was already before the court because the government had introduced it. There was therefore no reason for Picker to use it.

1  2006, Hr'g 15-16).  The court chose to credit Graham's testimony
2  that he had consulted with Roberts before almost every continuance
3  was requested.  There is thus no reasonable probability that had
4  Picker attempted to impeach Graham in the manner suggested by
5  Roberts that the result would have been any different.[10]

6      Roberts has thus failed to show that Picker rendered
7  ineffective assistance of counsel in connection with the speedy
8  trial issues in this case, or that any of Picker's actions
9  prejudiced Roberts' defense.

10      Finally, Roberts argues that this court should find prejudice
11  based on the totality of Picker's alleged errors.  Considering the
12  totality of Picker's representation, the court does not find that
13  Picker rendered ineffective assistance of counsel, or that his
14  representation prejudiced Roberts.  Accordingly, Roberts' first
15  ground for relief based on Picker's alleged ineffective assistance
16  of counsel is **DENIED.**

17  II. <u>Sentencing Enhancements</u>

18      Roberts argues pursuant to *Apprendi v. New Jersey*, 530 U.S.
19  466 (2000) and *Jones v. United States*, 526 U.S. 227 (1999) that his
20  Fifth and Sixth Amendment rights were violated when the court
21  enhanced his sentence based on facts that were not presented to and
22
23
24

25      [10] Roberts also asserts for the first time in his reply that the
26  government used Graham's testimony knowing it was a lie.  To the extent this
    is intended to be a standalone claim and not simply a reassertion of
27  Picker's alleged failings, the court will not consider this contention
    raised for the first time in the reply.  *See supra* n.2.  Even if the court
28  were to consider it, however, there is no evidence that Graham's testimony
    was perjured or that the government knew it to be so, as discussed above.

determined by the jury.[11]

Apprendi and Jones held that any fact (other than a prior conviction) that increases the maximum statutory penalty for a crime must be submitted to the jury and proven beyond a reasonable doubt. Apprendi, 530 U.S. at 490; Jones, 526 U.S. at 243 n.6. In light of these holdings, the Supreme Court in United States v. Booker, 543 U.S. 220 (2005) held that application of sentence enhancements based on facts not submitted to the jury violated the Sixth Amendment under the then-mandatory Sentencing Guidelines. The Court also held, however, that such constitutional concerns would not be present if the Sentencing Guidelines were advisory. Id. at 233. The Court held that the Guidelines are advisory, thereby "permitting a district court to impose a sentence anywhere within the range established by the statute of conviction without violating the Sixth Amendment." United States v. Treadwell, 593 F.3d 990, 1017 (9th Cir. 2010). Thus, a court may constitutionally apply sentence enhancements based on facts not presented to the jury so long as the defendant is sentenced below the statutory maximum for his or her offense. Id. at 1017-18 (citing United States v. Raygosa-Esparza, 566 F.3d 852, 855 (9th Cir. 2009)); see also United States v. Ameline, 409 F.3d 1073, 1077-78 (9th Cir. 2005) (en banc). The "statutory maximum . . . is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Cunningham v. California, 549 U.S. 270, 283 (2007).

_____

[11] Although nonconstitutional sentencing errors are not cognizable on a § 2255 motion, United States v. Schlesinger, 49 F.3d 483, 485 (9th Cir. 1994), Roberts' claim alleges that the court committed a constitutional violation in sentencing him. It is therefore cognizable.

The jury found Roberts guilty of kidnaping and conspiracy to kidnap. It also found him guilty of using a firearm during a crime of violence. The maximum sentence for all three convictions was life imprisonment. *See* 18 U.S.C. § 1201(a),(c); id. § 924(c); *United States v. Dare*, 425 F.3d 634, 640 (9th Cir. 2005) (holding that the statutory maximum sentence for a § 924(c) offense is life imprisonment). No facts beyond those necessarily found by the jury were required in order to sentence Roberts to life in prison. Roberts was sentenced to 117 months' imprisonment on the kidnaping counts and 84 months' imprisonment on the gun count. The sentences on the kidnaping counts were concurrent. Roberts' sentence was therefore below the maximum statutory penalty authorized by the jury's verdict.

Roberts also asserts that the sentence enhancements were "elements" of his offense, which were required to be presented to and proven to the jury. Roberts was subject to sentencing enhancements for his role as a leader or organizer of the kidnaping, for obstruction of justice, and for carrying a firearm. The enhancements were sentencing factors, not elements of his offense. *See Apprendi*, 530 U.S. at 494 n.19 (explaining that sentencing factors are those that support a specific sentence within the range authorized by the jury's finding, and that sentencing enhancements that increase a sentence beyond the maximum authorized statutory sentence are the functional equivalents of "elements"). The enhancements did not increase Roberts' sentence beyond the maximum authorized statutory sentence, which was life in prison, and therefore they were not elements that were required to be proven to the jury.

As Roberts' sentence was below the statutory maximum for his crimes, no constitutional violation occurred when the court applied sentencing enhancements based on facts not presented to and determined by the jury.  As there was no constitutional violation, Roberts' motion on his second ground for relief is **DENIED.**

III. Law Library Access

Roberts argues that his Fourteenth Amendment rights were violated because he did not have access to a law library when preparing to represent himself at sentencing.  The government contends that this claim is procedurally defaulted because it was not argued on direct appeal, and Roberts has not identified any cause for or prejudice from such failure.

"If a criminal defendant could have raised a claim of error on direct appeal but nonetheless failed to do so, he must demonstrate both cause excusing his procedural default, and actual prejudice resulting from the claim of error." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).

"Attorney error short of ineffective assistance of counsel . . . does not constitute cause and will not excuse a procedural default." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991).  In fact, "cause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. 478, 492 (1986).  Roberts has not asserted that his appellate counsel was ineffective in any way.  Nor has Roberts alleged that any external impediment prevented appellate counsel from raising this claim on appeal.  Therefore, Roberts has not demonstrated cause for the procedural default.

Roberts has also not explained in what ways his self-representation was harmed by the lack of a law library; he makes only a conclusory assertion that he could not adequately prepare. Roberts has not demonstrated that he was actually prejudiced by the alleged lack of access to a law library. Roberts has failed to support this claim.

Accordingly, as to this claim Roberts has shown neither cause nor prejudice to excuse the procedural default, Roberts' motion on the third ground for relief is **DENIED.**

IV. <u>Ineffective Assistance of Counsel – Attorney Loren Graham</u>

Roberts argues that pretrial counsel Graham was ineffective for failing to assert and protect his speedy trial rights.[12]  He asserts that in particular Graham failed to make the government comply with discovery in time for trial and failed to investigate why the government and co-defendants were asking for continuances. He also argues that Graham should have been able to proceed to trial as early as the summer of 2005 because all relevant evidence had been disclosed by that time.  He argues the repeated continuances prejudiced him in two ways: (1) the government was able to supersede the indictment against him, adding the § 924(c) charge; and (2) the government was able to secure the testimony of his co-defendants against him.

There is no evidence that Graham did not agree to the continuances or that the government and co-defendants' counsel misled him into signing the stipulations.  The government did not

_____

[12] In his reply, Roberts adds other actions Graham should have taken – such as moving to suppress the cell phone – to show that the totality of his actions have prejudiced him.  The court will not consider these contentions raised for the first time in the reply.  *See supra* n.2.

24

initiate any of the continuances, (Tr. of Aug. 17, 2006, Hr'g 27:20-25), and Roberts consented to all of the continuances until it became clear that his co-defendants were pleading, (*id.* at 26:6-27:16). After this, there were sound strategic reasons for the continuances.[13] (*Id.* at 27:17-20). There is no evidence to suggest that the continuances were made for the sole purpose of securing testimony against Roberts or that the government withheld discovery in order to delay the trial. Further, Roberts' assertion that Graham should have been able to proceed to trial earlier because the case was "simple" is without merit.

Roberts has failed to show that Graham rendered ineffective assistance of counsel or that he was prejudiced by Graham's conduct. Accordingly, his fourth ground for relief is **DENIED**.

V. False Witness Testimony

Roberts asserts that at trial the government knowingly presented the false testimony of six witnesses: (1) Anthony Gonzalez; (2) Frank Phillips; (3) Serena Crawford; (4) Jacob Belford; (5) Nick Calcese; and (6) Jared Chapman.

A criminal defendant's due process rights are violated when the government knowingly introduces false evidence or fails to correct the record when false evidence is presented. *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935); *Hayes v. Brown*, 399 F.3d 972, 974, 978 (9th Cir. 2005). To prevail on a *Mooney-Napue* claim, the defendant must show that

---

[13] Roberts asserts there were no strategic reasons to continue trail from July 11, 2005, to May 26, 2006, and requests an evidentiary hearing to explain. The court determines no evidentiary hearing is required on this point as the record supports a conclusion that there were strategic reasons for the continuances, and the Court of Appeals has reached the same conclusion.

"(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). "[T]he prosecution's failure to correct false testimony requires a new trial only if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Maxwell v. Roe*, 628 F.3d 486, 499-500 (9th Cir. 2010) (internal punctuation and quotation marks omitted) (quoting *Hayes*, 399 F.3d at 984-85). Under this standard, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984.

A. Anthony Gonzalez

Roberts asserts that Anthony Gonzalez was untruthful on the stand and that the government knowingly presented his false testimony.

First, Roberts argues that Gonzalez gave false testimony when he said that he was not receiving any benefits as a result of his testimony.[14] When the prosecutor asked Gonzalez whether he was

---

[14] Benefits received by a government witness through a plea bargain must be disclosed to the defendant, and the defendant must be allowed to cross examine the witness on the details of the plea agreement and other benefits. *See United States v. Mitchell*, 502 F.3d 931, 967 (9th Cir. 2007) (defendant must be allowed to cross examine a witness to make clear to the jury what benefit or detriment will flow from his or her testimony); *United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir. 1988) ("an accomplice who has plead guilty may testify against non-pleading defendants . . . [and] courts have . . . relied on cross-examination to uncover any false testimony that might be given"; testimony is valid as long as "the jury is informed of the exact nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the agreement, and the jury is instructed to weigh the

advised of any benefit he could receive from providing assistance to the government, Gonzalez responded "no." (Trial Tr. 296:15-18). The prosecutor then asked Gonzalez whether he had signed an agreement with the government, to which Gonzalez responded "yes." (*Id.* at 296:21-23). The prosecutor asked Gonzalez if he recalled the terms of the agreement, and Gonzalez responded yes. (*Id.* at 296:24-297:11). The prosecutor therefore corrected Gonzalez's initial testimony.

However, Roberts' counsel then asked Gonzalez what he expected to get out of his testimony. (*Id.* at 410:8-15). Gonzalez replied, "I hope that they may give me a couple of points off. But I know that, ultimately, it's up to the judge and to the government. I don't really have any expectations." (*Id.* at 8-11). There was no further discussion of the benefits Gonzalez had received or expected to receive. Roberts' counsel did not object to Gonzalez's testimony.

Where a witness who has received benefits or will receive benefits denies as much on the stand, the government is under an obligation to correct the false testimony. *See United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003) (holding that government breached its duty of candor to correct testimony of witness who claimed he was not receiving any benefits, but holding that under a

accomplice's testimony with care"). Benefits that must be disclosed include "any lenient treatment." *Benn v. Lambert*, 283 F.3d 1040, 1057 (9th Cir. 2002) (*Brady* violation occurred where government failed to disclose that it had arranged for a witness to be released from jail without being charged with a traffic offense and for the dismissal of unrelated burglary charges). Roberts has not asserted that the government failed to disclose Gonzalez's plea agreement or any of the other benefits Gonzalez received as part of his testimony. In fact, the record reflects that Gonzalez's plea agreement was disclosed to Roberts by the government. (Tr. of Aug. 17, 2006, Hr'g 29:16-25).

plain error standard the breach had not affected the defendant's substantial rights because there was ample evidence other than the witness' testimony to establish defendant's guilt and prosecutor had not relied on witness' testimony in closing).

Gonzalez did not give false testimony about the benefits he expected to receive. The plea agreement required Gonzalez to plead to the conspiracy to kidnap charge. (*See* Gonzalez Plea Agm't ¶ 1.1). The remaining charges were to be dismissed at sentencing. The plea agreement noted that the government would consider filing a motion for downward departure based on substantial assistance and would recommend a sentence at the low end of the guidelines. But the agreement also clearly stated that the court was not obligated to grant either of these requests and could sentence Gonzalez up to the statutory maximum. (*Id.* at 1.15, 1.18). Gonzalez did not give false testimony when he stated that he hoped to get a "couple points off" but that it was up to the government and the court. Picker had access to the plea agreement for his cross examination of Gonzalez. Insofar as the § 924(c) charge is concerned, there is no evidence before the court that the government had entered into an agreement with Gonzalez to withhold charging him with a § 924(c) violation in exchange for his testimony.

In addition, there is substantial and compelling evidence in the record, independent of Gonzalez's testimony, to support Roberts' conviction. Chapman testified in great detail as to Roberts' involvement in the kidnaping and his use of a weapon, as did Roberts himself.

Second, Roberts asserts that Gonzalez gave false testimony when he testified it was Roberts' drug deal and drug money, and

that Roberts had a gun in California. Roberts has provided no
evidence aside from his own assertion that these statements were
false. Inconsistencies between witnesses' testimonies go to
credibility, which is a determination for the jury; the mere fact
that one witness's testimony contradicts another's does not
conclusively establish that the prosecutor knew the witness was
lying. *United States v. Zuno-Arce*, 44 F.3d 1420, 1422-23 (9th Cir.
1995). Roberts has failed to establish that Gonzalez's testimony
was false or that the government knowingly presented false
testimony.

The court will not consider other claims of Roberts raised for
the first time in his reply.

Accordingly, the court finds that Roberts has failed to show
that Gonzalez gave materially false testimony or that the
government's conduct in presenting the testimony to the jury
violated Roberts' constitutional rights.

B. Frank Phillips

Before trial, Frank Phillips told investigators that he knew
Gonzalez was going to Sacramento to meet with Chapman and buy
Ecstacy. (Second Supp. to Petition Ex. A). At trial, Roberts
called Phillips as a witness. Roberts asserts that in the
following exchange, Phillips denied any knowledge of Gonzalez's
plan:

> Q: You, prior to May 1st of 2005, even the day before
>    that, did you know that Anthony Gonzalez was going
>    to be meeting with Jared Chapman in Sacramento.
> A: Actually I did not.
> . . . .
> Q: Did you know he – that he was going to see Jared
>    Chapman?
> A: Nope. Not at all.
> Q: Did you know why Anthony Gonzalez was meeting with

```
              Jared Chapman?
         A:   Nope.
         . . .
         Q:   [Did you tell investigators t]hat Anthony was
              looking to find a good source of ecstacy?
         A:   No.
         Q:   That's not true?
         A:   No.
```

(Tr. 717-19).

In citing this exchange, however, Roberts leaves out important parts of the testimony. Specifically, in between those questions Picker asked Phillips about his earlier statement that "Anthony was going down to Sacramento to meet with Jared Chapman." Phillips explained that he knew Gonzalez was looking for an Ecstasy source but he did not know the "particular time, that particular day with Jared that's what they were going there to do, that weekend." (*Id.* at 718-19). Because Picker brought out Phillips' alleged prior inconsistent statement and Phillips explained the inconsistency, the government had no obligation to examine further.

Even assuming that Phillips' pretrial and trial statements were inconsistent, the fact that a witness made a prior inconsistent statement does not necessarily mean that the witness' statement on the stand is false. "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); *see also United States v. Baker*, 850 F.2d 1365, 1372 (9th Cir. 1988) (a witness' prior inconsistent statement does not by itself establish "that the prosecutor knew the prior statement was true but used it anway"). And Phillips' statements at Roberts' sentencing hearing did not establish that his trial testimony was false.

Further, Phillips' testimony on this issue was not material. A *Napue* violation requires a court to ask whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Libberton v. Ryan*, 583 F.3d 1147, 1164 (9th Cir. 2009). Roberts asserts that Phillips' testimony was crucial to show that Roberts had no motive to kidnap Chapman and did not act to secure some benefit to himself. 18 U.S.C. § 1201(a); *United States v. Vetere*, 663 F. Supp. 381 (S.D.N.Y. 1987). At most, however, Phillips' testimony would have supported a theory that it was Gonzalez's drug deal and Gonzalez's money that was stolen, and thus the kidnaping was to secure some benefit to Gonzalez. Roberts was charged with kidnaping and aiding and abetting in the kidnaping. Even if Roberts' theory was accepted by the jury, the evidence clearly established that Roberts aided and abetted in the kidnaping. There is no reasonable likelihood that this testimony affected the verdict of the jury.

C. Serena Crawford

Roberts argues that Serena Crawford gave false testimony and that the government not only failed to correct her testimony but also repeated it in closing arguments. He cites to an Eleventh Circuit case that held "the failure of the prosecutor to correct the perjured testimony of the government's essential witness, and her capitalizing on it in her closing argument, when defense counsel is also aware of the perjury and does not object to it, requires a new trial." *Demarco v. United States*, 928 F.2d 1074, 1075-76 (11th Cir. 1991).

Roberts asserts that before trial Crawford stated that when she went over to Roberts' house around 6:30 p.m. on May 2, 2005,

she "could sense that he was stressed out . . . [and] wasn't normal." At trial, Roberts' attorney asked Crawford about her meeting with Roberts on the afternoon of May 2, 2005, in which she gave Roberts money in the alley behind his house. Picker did not ask Crawford about defendant's demeanor at that time. (Tr. 734-35). Picker then asked when Crawford next saw or spoke to Roberts, and Crawford indicated that she spoke to Roberts by phone later that day. At that point the prosecutor asked how Roberts sounded, and Crawford said, "Okay." (Tr. 736-37).

Roberts asserts that Crawford's characterization of his demeanor as "okay" was inconsistent with her earlier statement that he seemed "stressed." Crawford's statements are not inconsistent as they refer to different interactions she had with Roberts. When Crawford said Roberts seemed stressed out, she had been referring to their in-person meeting in the alley behind his house. When she said at trial that Roberts was "okay," she was referring to her later telephone conversation with him. Even if this statement was incorrect, Roberts has failed to show that the witness gave false testimony or that the government failed to correct perjured testimony.[15] *See Baker*, 850 F.2d at 1372.

D. Nick Calcese, Jacob Belford, and Jared Chapman

Roberts claims that Calcese testified falsely about Gonzalez giving him a gun belonging to Roberts, that Belford gave false testimony about his involvement in the kidnaping, and that Chapman testified falsely about Roberts using a gun. Inconsistent

---

[15] Roberts cites Crawford's statements at his sentencing and in a recent affidavit to prove her statements at trial were false. As both of these statements came after trial, neither proves that government knowingly presented false testimony at trial.

32

statements do not necessarily establish that a witness is lying.
*See Baker*, 850 F.2d at 1372. Contradictory statements bear on
credibility and are a matter for impeachment. *See United States v.
Zuno-Arce*, 44 F.3d 1420, 1422-23 (9th Cir. 1995) (inconsistencies
go to credibility, which is a determination for the jury, and the
mere fact that a witness' testimony contradicts another's does not
conclusively establish that the prosecutor knew the witness was
lying). Many of the alleged contradictory statements highlighted
by Roberts came *after* trial, at Roberts' sentencing. There is no
credible evidence that the prosecution knowingly presented false
testimony to the jury.

Accordingly, Roberts has failed to show that the government
knowingly presented or failed to correct false evidence at trial.
Roberts' fifth ground for relief is **DENIED**.

**Conclusion**

In accordance with the foregoing, Roberts' motion to vacate,
set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (#377)
is hereby **DENIED**.

IT IS SO ORDERED.

DATED: This 9th day of July, 2012.

_Howard D McKibben_
_____
UNITED STATES DISTRICT JUDGE

33